# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **SHARON R. MITCHELL, ET AL.,** | : | |
| | : | |
| **Plaintiffs,** | : | |
| | : | **CIVIL ACTION** |
| **v.** | : | |
| | : | **NO. 99-6306** |
| **CITY OF PHILADELPHIA, ET AL.,** | : | |
| | : | |
| **Defendants.** | : | |

### MEMORANDUM AND ORDER

**Tucker, J.**                                                    **September 16, 2008**

Plaintiff Sharon Mitchell, and Plaintiff class members (collectively, "the nonmembers")

are or were employees of the City of Philadelphia ("City").  The nonmembers are represented,

exclusively for purposes of collective bargaining, by Defendant District Council 33 of the

American Federation of State, County, and Municipal Employees International, AFL-CIO

("District Council 33").[1]  District Council 33 is chartered by the American Federation of State,

County, and Municipal Employees International ("AFSCME International"), affiliated with the

Pennsylvania AFL-CIO and the Philadelphia Council of the AFL-CIO, and has fourteen (14)

constituent locals, ten (10) of which represent different segments of City employees.

In 1989, the City and District Council 33 agreed to deduct agency, or fair share, fees from

the members of the bargaining unit who decided not to join the union.[2]  The current and

---

[1] The other defendants in this matter are the City, Mayor Edward G. Rendell, Managing Director Joseph C. Certaine, Personnel Director Linda Seyda, Finance Director Ben Hayllar.  The Court's discussion is limited to District Council 33 because the remaining issue before the Court—Plaintiff's chargeability claim—involves only Defendant District Council 33 in its central aspects.  Plaintiff's other claims—insufficient notice and invalid indemnification clause—were previously disposed of by the Court and thus will not be discussed.

[2] An agency shop arrangement permits a union, obliged to act on behalf of all employees in the bargaining unit, to charge nonunion workers their fair share of the costs of the representation.  See generally 43 PA. STAT. ANN. §§ 1102.1-.9 (authorizing public sector agency shop agreements); 43 PA. STAT. ANN. § 1102.2 (defining

preceding City-District Council 33 collective bargaining agreements have provided for mandatory uniform deductions from the wages of nonmember employees.  The agency fees are collected by the City and forwarded to District Council 33, which sends to the local unions a portion of the collected funds to finance their expenditures.  District Council 33 also sends a portion of the funds to its parent organization, AFSCME International.  The remaining funds collected are used by District Council 33 to finance its own expenditures.

The agency fee assessed from non-union employees is provided in an annual notice, which lists the portion of the fees payable to AFSCME International, District Council 33, and the locals.  Since 1989, District Council 33 has relied on a single individual, Vernon Person, C.P.A., to compute the fair share fee, or conduct the <u>Hudson</u>[3] calculation, for District Council 33 and the locals and to prepare the annual notices.  AFSCME International performs its own <u>Hudson</u> calculation, which Mr. Person incorporates into the annual notice. On an annual basis between 1990 and December 1997, notices were distributed to the nonmembers.  In September 1998, Mr. Person was unable to fulfill his duties in preparing the annual notice for fiscal year 1997.  He did not resume working until September 2000.  At that juncture, the nonmembers had not been provided with annual notices for the intervening two years; however, agency fees were still deducted from the nonmembers' wages during that time.  On or after September 20, 2000, Mr. Person provided notices for fiscal years 1997 and 1998 (or the periods July 1, 1996 to June 30, 1997 and July 1, 1997 to June 30, 1998, respectively).  On or after December 29, 2000, Mr.

---

"fair share fee" as "[t]he regular membership dues required of members of the exclusive representative, less the cost for the previous fiscal year of its activities or undertakings which were not reasonably employed to implement or effectuate the duties of the employee organization as exclusive representative").

[3] <u>Chicago Teachers Union, Local No. 1 v. Hudson</u>, 475 U.S. 292, 306 (1986) (holding that a union must provide nonmembers with "sufficient information to gauge the propriety of the union's fee").

Person provided the notice for fiscal year 1999 (or the period July 1, 1998 to June 30, 1999). Thereafter, Mr. Person provided annual notices without interruption.

The notices provided to nonmembers delineate (1) the total funds (union dues and agency fees) collected which also represents total expenses, (2) total chargeable expenses, (3) total non-chargeable expenses, and (4) the chargeable percentage of total expenses for AFSCME International, District Council 33, and the locals during the previous fiscal year. The notices also delineate the total combined chargeable rate, or the percentage of the union dues which must be paid by the nonmembers via fair share fee during the successive fiscal year. In addition, the notices provide more detailed schedules of expenses, or lists of categories of expenses and their accompanying chargeable/nonchargeable allocation for AFSCME International, District Council 33, and the locals. These schedules are preceded by a verification statement from an independent auditor. For the locals, the notices present an aggregate of their expenses as well as an audit of consolidated local expenses rather than separate audits for each local.

In their Complaint, Plaintiffs challenge the accuracy of the agency fees assessed for fiscal year 1997 to the present, claiming that Defendant "seized agency fees in amounts which exceed that permitted by the First and Fourteenth Amendments to the United States Constitution, because portions of the total [agency] fee are used for union activities which cannot be financed from fees of nonmembers." Pls.' Second Amend. Compl. Plaintiffs also object to the methodology used to calculate the agency fee, claiming that it does not yield an accurate tally of chargeable expenses. In sum, Plaintiffs assert a substantive challenge to the agency fees.

A bench trial was held before the Court on April 14-18, July 21-25, and July 29-30, 2008 to determine the propriety of the agency fees assessed beginning with Defendant's fiscal year

3

1997 and the procedures used in calculating such fees.  Subject matter jurisdiction is invoked

under the federal question statute, 28 U.S.C. § 1331.  Pursuant to Rule 52(a) of the Federal Rules

of Civil Procedure, the Court makes the following Findings of Fact and Conclusions of Law:

## I.        FINDINGS OF FACT

### A.        Calculation Procedures

#### 1.        AFSCME International

AFSCME International is comprised of 32-36 constituent councils, 3200 local unions,

and 1.2 million members.  Its headquarters are in Washington, DC and 431 employees are

responsible for its operations.  The International's <u>Hudson</u> calculation is performed in house in a

three step process involving its individual departments, General Counsel, and Accounting

Department.  The calculation is then reviewed by an independent auditor.

At the beginning of each year, the International's General Counsel's Office sends to all

thirty-two (32) of the International's departments notice that each department should determine

the chargeability of the previous year's personnel costs and direct payments to vendors.  At the

beginning of each year, the International's General Counsel's Office sends to all thirty-two (32)

of the International's departments notice that each department should determine the chargeability

of the previous year's direct payments to vendors and personnel costs.  To assist the departments

in delineating chargeable and nonchargeable expenses, the International designed thirty-five (35)

criteria for chargeability.  <u>See</u> D-4, Appendix A (Hudson Procedure).

For direct payments to vendors, the relevant department must complete an Expense

Authorization Form (EAF) before payments can be made.  The EAFS are later reviewed for

chargeability. To determine chargeable personnel costs for headquarters employees, each

department completes Board Reports (quarterly reports) and Eye Openers[4] (weekly reports).

For employees working outside of headquarters, chargeable staff time is determined from Time Record Forms, or time sheets used only by the field staff. In calendar year 1996, the number of employees required to complete these forms numbered 161 out of 431 total employees. In 1996, there were twenty-eight (28) area offices, including one in Pittsburgh that ran the operations for field staff working in Pennsylvania. Field staff employees receive their work instructions from headquarters and complete the Time Record Forms on a bi-monthly basis.

Once the individual departments make their determinations on chargeable expenses, they forward same to the General Counsel for its determination. The General Counsel analyzes their determinations before sending the information to the Accounting Department. The Accounting Department receives the individual department determinations approximately 3 months after the General Counsel issues its initial notice to the departments. After the determinations are received in the Accounting Department, the Budget Supervisor and three other employees compile the information and create an Excel spreadsheet with 28 schedules from which the Hudson calculation is made. The schedules created list the categories of spending for each individual department and outline their chargeable and non-chargeable expenses. The Lead Schedule lists the total amount spent by each department, and the total chargeable and non-chargeable expenses for the International. The process for determining the International's

---

[4] The weekly Eye Openers state the goals and objectives for the week and recite activities that occurred. Typically, in each department of the International, an administrative assistant or lead personnel person meets with the staff on a weekly basis to obtain information on the staff member's activities during the previous week. Headquarters staff members maintain records on their activities and associated travel costs, if any, in anticipation of the weekly meeting. While the procedure described above is typical, there is no uniform procedure for preparing weekly Eye Openers. By way of contrast, in some departments, individual staff members write summaries of their activities and then all summaries are combined to create that department's weekly Eye Opener.

Hudson calculation takes approximately three (3) months and requires about 2,500 man hours.

The International's Hudson calculation and supporting documents are then sent out for an independent audit.  The independent auditor reviews the information and issues an audit report as to the propriety of the International's calculation.  An independent audit is performed every year. Once the calculation is approved by the independent auditor, the International forwards the calculation to its constituent locals, including District Council 33.  District Council 33, in turn, incorporates the International's calculation into its annual notice.

### 2. District Council 33

During the relevant period, District Council 33 represented approximately 12,000 employees for purposes of collective bargaining.  It employed twenty-five to twenty-seven (25-27) individuals and rented an entire floor of a commercial building in downtown Philadelphia to conduct its operations.  The floor was divided into office space for District Council 33's employees and office space for most of District Council 33's fourteen constituent locals.

District Council 33 has three (3) officers: President, Vice President, and Secretary-Treasurer.  All officers are elected, paid employees.  Since 2000, the officers have been elected by members.  Prior to 2000, they were elected by union delegates.  The three officers, with the assistance of their administrative assistants, maintain appointment books documenting their planned daily activities.  Like all managerial and executive employees of the council, the officers do not maintain contemporaneous time records beyond the aforementioned appointment books.

The Controller of District Council 33 is responsible for its financial and accounting procedures. The Controller is appointed and confirmed by the Executive Board, which consists of the three (3) council officers and two representatives from each constituent local.   The

Controller's job duties include maintaining all financial records and generating financial statements (figures therein are not designated chargeable/non-chargeable), which are then given to an independent auditor for review.  District Council 33's financial records are kept on an accrual basis and purged after the applicable audit period.  Prior to purging the financial records, the Controller makes the documents available to Vernon Person for the Hudson calculation.

To compute District Council 33's fair share fee, Mr. Person used the council's financial records as well as a variety of other sources, including but not limited to: employee job descriptions, written reports of union activities, expense vouchers, appointment books, direct payments to vendors, newsletters, expense receipts, descriptions of conventions and conferences meeting agendas and minutes, and notes from his interviews of all District Council 33 employees (hereinafter, "Work Papers").  Mr. Person normally interviewed council employees to determine time spent on chargeable and nonchargeable activities at the close of the fiscal year.  During his two year absence, however, no interviews were conducted; instead, Mr. Person interviewed the council employees upon his return in September 2000.  The testimony at trial established that at the time of the interview irrespective of when it occurred—i.e., months or years after the close of the relevant fiscal year, the council employees were able to respond to Mr. Person's inquiries regarding their activities with candor and sufficient memory.

In addition to employee interviews and the information in his Work Papers, Mr. Person relied on his past knowledge of council activities, the previous year's calculation, the thirty-five (35) criteria for chargeability developed by the International, as well as federal court decisions and legal commentary regarding Hudson calculations to determine District Council 33's chargeable expenses.  See D-4, Appendix A (AFSCME International's Hudson Procedure) and

D-6 (Fair Share Fee References).  Where Mr. Person's Work Papers do not provide adequate

support for a particular expense, he designated the expense as non-chargeable.

After calculating the council's fair share fee, Mr. Person forwards the calculation and

supporting documentation to an independent auditor for review.  Since 1989, Tariq Safdar has

performed the independent audits of District Council 33's <u>Hudson</u> calculation.  To ensure that

the chargeable personnel expense allocation was substantiated, Mr. Safdar interviews council

employees regarding their duties and activities.  He also reviews the appointment books, non-

managerial staff time sheets, and payroll records.  While officers and other managerial employees

maintain appointment books documenting their planned activities, non-managerial staff members

maintain daily time sheets (clock-in, clock-out system).[5]  Once Mr. Safdar approves the council's

<u>Hudson</u> calculation, Mr. Person combines same with the calculations for the International and the

combined locals (discussed <u>infra</u>) into the annual notice provided to nonmembers.

### 3.    Local Unions

As stated above, during the relevant period, District Council 33 had ten (10) constituent

locals which represent different segments of City employees.  The locals vary in size: the biggest

local represents approximately 2100 employees and the smallest approximately 100.   Most

locals have at least one paid official—President, Business Agent, Treasurer, and/or Recording

Secretary—who receive an annual salary or monthly stipend.  All locals have a Business Agent,

---

[5] At trial, Mr. Safdar testified that when he first began auditing District Council 33's <u>Hudson</u> calculation, he made verbal recommendations to District Council 33 to improve its record-keeping system for personnel time but the council stated doing so would not be practical because of the nature of the jobs of its employees (e.g., telephone conversation one minute, processing an invoice in the next).  Despite his initial recommendations, he now believes that District Council's <u>Hudson</u> calculation would not be made more reliable by maintenance of contemporaneous time records. Mr. Safdar further testified that if he had viewed the lack of contemporaneous time records as truly problematic, he would have added a qualification statement to his audits of the council's <u>Hudson</u> calculation.

who handles employee grievances, stewards (employees who serve as liaisons between the union and other employees), and delegates (employees who attend and vote at monthly meetings).  The local union's stewards and delegates receive monthly stipends, and are typically the same individuals.  Employees of the locals do not maintain contemporaneous time sheets.

Each local is responsible for maintaining its own financial records.  Not all locals have audits performed on their financials prior to Mr. Person's gathering same.  The Hudson calculation for the locals is performed in a similar manner as the District Council 33's calculation—i.e., Mr. Person interviews employees; gathers Work Papers; relies on his knowledge of past activities, the prior year's calculations, the International's thirty-five (35) criteria, and legal cases and commentary concerning Hudson calculations; and evaluates expenses for chargeability.   Notably, the evidence at trial established that like the council employees, at the time of Mr. Person's interview, the local union employees were able to respond to Mr. Person's inquiries regarding their activities with candor and sufficient memory irrespective of whether the interview was conducted just months or years after the close of the relevant fiscal year.  After all expenses for the locals are evaluated for chargeablity, the calculations are consolidated and, along with their supporting documentation, forwarded to Mr. Safdar for an independent audit.  Once approved, the consolidated calculation is incorporated into the annual notice provided to nonmembers.

### B.    Categories of Expenditures[6]

#### 1.    Assistance to Affiliates Fee

AFSCME International assess an annual fair share fee irrespective of whether any direct services are provided to the nonmembers' bargaining unit.  Further, a portion of the International's agency fee covers assistance to affiliates or support services provided to local unions.  Assistance is available to all 3200 locals although the assistance provided varies from year to year.  In most cases, support services are requested by the locals but assistance may be provided on the International's initiative.  In the annual notice provided to nonmembers, the International's assistance to affiliates expense is not divided by individual council or local union. Instead, the expense is aggregated and separated into chargeable and nonchargeable allocations.

#### 2.    Organizing expense

In fiscal year 1996, District Council 33 incurred an organizing expense of $50,538.00 which was deemed chargeable to nonmembers.  The campaign aimed at internal organizing of court employees in the City.  The sought-after employees were not represented by a collective bargaining agreement and District Council 33 wished to expand its representation of court employees by securing the union membership of the aforementioned employees.  Ultimately, the campaign was unsuccessful.

---

[6] The Court will limit its discussion to the categories of expenditures to which the nonmembers objected at trial, namely: (1) AFSCME International's assistance to affiliates fee; (2) organizing expenses; (3) newsletter expenses; (4) conference and convention expenses; and (5) personnel costs.  See Air Line Pilots Ass'n v. Miller, 523 U.S. 866, 878 (1998) (indicating that the challenging nonmembers must make their specific objections plainly known and assert their objections with the level of specificity appropriate for the particular stage of litigation).

### 3.      Newsletter expenses

District Council 33 and several locals produce quarterly newsletters.  During the relevant period, newsletters were mailed to all union members and made available to nonmembers in the offices of District Council 33 and the locals.  Employees contributing to production of the newsletters did so on a voluntary basis and during non-work hours. The content of the newsletters was varied but included articles on contract negotiations, unemployment and health benefits, proposed or recently enacted legislation, general news, union election results, and recreational and social activities.  For allocation of newsletter expenses, Mr. Person designated the content as chargeable or non-chargeable then measured the newsletters to obtain the ratio of chargeable content square inches to non-chargeable content square inches.  That ratio was then applied to printing and postage costs.

### 4.      Conference and convention expenses

Various employees of District Council 33 and the locals attended several conferences and conventions during the relevant period.  To allocate the attendance expenses, Mr. Person reviewed the written descriptions of and agendas for the events and interviewed employees regarding their attendance.  Where he deemed an event relevant to the union's collective bargaining duties, its associated attendance expenses were assessed as chargeable.

### 5.      Personnel costs

Personnel costs comprise the largest portion of the agency fee assessed to nonmembers. As stated above, District Council 33's non-managerial employees maintained time sheets (clock-in, clock out system).  With the exception of District Council 33's officers who maintained appointment books documenting their planned activities, District Council 33's managerial

employees and all employees for the local unions did not generally maintain contemporaneous time records. To allocate personnel costs, Mr. Person relied on his knowledge of employee job duties, reviewed employee job descriptions, interviewed all employees regarding their activities in the past fiscal year, reviewed the appointment books of District Council 33's officers, and perused his Work Papers to identify nonchargeable activities. Time spent on nonchargeable activities was then deducted from total time to obtain total chargeable time. Once the proportion of chargeable/nonchargeable activity was discerned for each employee, that ratio was multiplied by the amount of the employee's salary or stipend to obtain the chargeable personnel costs for that particular employee and where applicable, his or her administrative assistant. Next, the chargeable personnel costs for all employees were combined to obtain the proportion of total chargeable personnel costs to total personnel costs. That ratio was then applied to expenses that flow with labor, such as building costs and office expenses for ease of calculation.[7]

## II.    CONCLUSIONS OF LAW

### A.    Calculation Procedures

Plaintiffs challenge the procedure used for the <u>Hudson</u> calculations of District Council 33 and the consolidated local union expenses, arguing that the methodology employed by Vernon Person do not allow for an accurate assessment of chargeable expenses. The union need only use a calculation procedure that provides a reasonable basis for the agency fee assessed; "'absolute precision' in the calculation of the charge to nonmembers cannot be 'expected or required.'"

---

[7] Notably, Plaintiff's expert, Irving B. Ross, C.P.A., previously testified that calculation of overhead and administrative expenses in the same percentage as personnel costs is a sound cost accounting principle. Transcript of Trial (notice and invalid indemnification clause claims) at 49, Mitchell, et al. v. City of Philadelphia, et al. (No. 99-6306) (Doc. 89).

Chicago Teachers Union, Local No. 1 v. Hudson, 475 U.S. 292, 294 (1986) (quoting Bhd. of Ry. and S.S. Clerks v. Allen, 373 U.S. 113, 122 (1963)).  To determine chargeable expenses for District Council 33 and the locals, Mr. Person relied on a variety of sources, including but not limited to: financial records, employee job descriptions, written reports of union activities, expense vouchers, appointment books, direct payments to vendors, newsletters, expense receipts, descriptions of conventions, conferences, and meetings, meeting minutes, notes from his interviews of employees, the previous year's calculations, the thirty-five (35) criteria for chargeability developed by the International, federal court decisions and legal commentary regarding Hudson calculations.  In addition, Mr. Person has calculated District Council 33's fair share fee for nearly twenty (20) years and has acquired knowledge and experience to assist him in making the calculations.

Mr. Person's general methodology was designed to elucidate chargeable expenses, or expenditures incurred for the benefit of both members and nonmembers, and is therefore proper. Cf. Ellis v. Bhd. of Ry. Clerks, 466 U.S. 435, 488 (1984) (stating that "objecting employees may be compelled to pay their fair share of not only the direct costs of negotiating and administering a collective-bargaining contract and of settling grievances and disputes, but also the expenses of activities or undertakings normally or reasonably employed to implement or effectuate the duties of the union as an exclusive representative of the employees in the bargaining unit").  However, Mr. Person did not employ his general methodology when evaluating personnel expenses, choosing instead to elucidate nonchargeable time by presuming staff time to be chargeable and then deducting time spent on nonchargeable activities.  Although chargeable expenses must be affirmatively proven, subtracting the amount of nonchargeable staff time from total staff time in

13

a uniform manner to ascertain chargeable time is reasonable because it would yield the same amount of time as adding together all chargeable time.  See Hohe v. Casey, 956 F.2d 399, 414-15 (3d Cir. 1992) (approving subtraction of nonchargable expense from total expenses methodology as valid measurement of chargeable expenses and rejecting argument that the methodology unconstitutionally shifted the burden of proof to the objecting employees).   Because Mr. Person's methodologies for calculating the agency fees evaluated all expenditures for chargeable expenses using uniform standards, the methodologies were reasonable and proper.

### B.      Specific Categories of Expenditures

Agency fees assessed from nonmembers may be "used to finance expenditures by the Union for the purposes of collective bargaining, contract administration, and grievance adjustment."  Air Line Pilots Ass'n v. Miller, 523 U.S. 866, 875 (U.S. 1998); accord Hudson, 475 U.S. at 306-07 (indicating that nonmembers may be charged only for expenditures which are provided for "the benefit of nonmembers as well as members").  Where public employee unions are involved the purposes for which the union may utilize the agency fee paid by nonmembers are further circumscribed by the First Amendment.  Miller, 523 U.S. at 868.  To be properly chargeable, expenditures supporting the agency fees assessed from public employees "must (1) be 'germane' to collective bargaining activity; (2) be justified by the government's vital policy interest in labor peace and avoiding 'free riders'; and (3) not significantly add to the burdening of free speech that is inherent in the allowance of an agency or union shop."  Lehnert v. Ferris Faculty Ass'n., 500 U.S. 507, 519 (1991).  The union has the burden of showing, by a preponderance of the evidence, that the expenditures were properly designated as chargeable and thus the agency fee properly assessed.  Miller, 523 U.S. at 878; Lehnert, 500 U.S. at 524;

14

Hudson, 475 U.S. at 306; Ellis, 466 U.S. at 457; Abood v. Detroit Bd. of Educ., 431 U.S. 209,

239 n. 40 (1977); Allen, 373 U.S. at 122; Otto v. Pennsylvania State Educ. Ass'n NEA, 330 F.3d

125, 139 (3d Cir. 2003); Hohe, 956 F.2d at 408; see also Court's Order entered October 24,

2007, Mitchell et al. v. City of Philadelphia (No. 99-6306) (Doc. 110) (stating applicable burden

of proof).  If the union is unable to meet its burden as to a particular expenditure, a refund must

be issued to the nonmembers and an injunction imposed to prevent future designations of the

expenditure as chargeable to the nonmembers.  Allen, 373 U.S. at 122; Hohe, 956 F.2d at 415.

### 1.      Assistance to Affiliates Fee

Plaintiffs challenge the propriety of AFSCME International's assistance to affiliates fee,

arguing that no fee should have been assessed because no direct services were provided to

District Council 33 or the locals during the relevant period.  It is well-established that services

need not have been provided directly to the nonmembers' bargaining unit for the expenses of the

local union's parent organization to be chargeable.  Lehnert, 500 U.S. at 524 (stating that "local

bargaining representative may charge objecting employees for their pro rata share of the costs

associated with otherwise chargeable activities of its state and national affiliates, even if those

activities were not performed for the direct benefit of the objecting employees' bargaining unit").

An extra-unit expense that is divided among the parent organization's affiliates is properly

chargeable if the nonmembers' bargaining unit "derives a "tangible benefit" from the expense.

See Otto, 330 F.3d at 136; Lehnert, 500 U.S. at 523-24.  Here, the nonmembers derived a

tangible benefit from the International's assistance to affiliates expense' the expense functioned

as insurance because the International's support is made available to all 3200 locals, support is

provided when needed, and the expense is split among the locals.

> The essence of the affiliation relationship is the notion that the parent will bring to bear its often considerable, economic, political, and informational resources when the local is in need of them.  Consequently, that part of a local's affiliation fee which contributes to the pool of resources potentially available to the local is assessed for the bargaining unit's protection, even if it is not actually expended on that unit in any particular membership year.

Lehnert, 500 U.S. at 523; accord Otto, 330 F.3d at 136, 139 (noting that a local union benefits from "the availability of on-call resources greater than those it could muster individually" and stating that expense pooling serves as insurance with a premium in the form of a pro rata share of the expense).  Although the International did not provide direct services to the nonmembers' bargaining unit during the relevant period, its assistance to affiliates expense nonetheless was properly chargeable.

### 2.    Organizing expenses

Plaintiffs contend that in fiscal year 1996, Defendant improperly designated as chargeable $50,538.00 in organizing expenses incurred for the purpose of recruiting new union members outside of the nonmembers' bargaining unit.  Organizing expenses are funds spent on individuals who are not union members—i.e., workers who are outside of the collective bargaining unit already represented by the union.  Ellis, 466 U.S. at 452-53.  Recruitment of new union members is germane to collective bargaining as it provides the potential benefit of increased representational strength; however, use of agency fees to fund organizing expenses significantly infringes on the free speech rights of nonmembers by compelling their approval of another individual's participation in an association which the nonmembers have explicitly declined to join.  In other words, the benefit to the nonmembers of a potentially stronger exclusive bargaining agent is too attenuated to create a free-rider problem and to justify the substantial

16

burden placed on their free speech rights.   Id.; see also Lehnert, 500 U.S. at 519.  Thus, fiscal

year 1996's organizing expense of $50,538.00 was improperly designated as chargeable.

### 3.        Newsletter expenses

Plaintiffs assert that the newsletters produced by District Council 33 and some locals

contain non-chargeable content which was erroneously deemed chargeable.  Plaintiffs also claim

that the portion of printing and postage costs deemed chargeable was excessive because the

nonmembers were not mailed copies of the newsletters but instead copies were made available to

them in the offices of District Council 33 and the locals.  First, newsletter publication costs are

only chargeable to the extent that the content concerns activities which are chargeable.  Ellis, 466

U.S. at 444.  In the same vein, nonchargeable content may not serve as the basis for chargeable

publication costs.  Id.  At trial, Plaintiffs complained that the newsletters contained articles

concerning legislation, union conventions, and union developments.  However, the content at

issue concerned proposed and recently enacted labor legislation, union conventions during which

collective-bargaining was discussed, and developments at the union such as elections and

expansion and improvement of union facilities – i.e., activities related to the union's activities as

exclusive bargaining agent and/or for the purpose of worker education.  Ellis, 466 U.S. at 450-51

("The union must have a channel for communicating with the employees, including the objecting

ones, about its activities. … The magazine is important to the union in carrying out its

representational obligations and a reasonable way of reporting to its constituents."); see also

Lehnert, 500 U.S. at 519, 529; Hohe, 956 F.2d 399 (stating that nonmembers may be required to

pay their fair share of expenses which are reasonably related to the duties of the union as

exclusive bargaining agent).  Because the challenged content merely kept employees abreast of

union activities and developments and reported on labor legislation which would affected or

potentially could have affected all employees within the union's bargaining unit, members and

nonmembers alike, the content was properly deemed chargeable.

 Second, nonmembers may not be billed for expenses which do not inure to their benefit.

Lehnert, 500 U.S. at 523-24.  Here, the newsletters were not mailed to the nonmembers and

printing and postage costs were allocated without regard for that fact.  Thus, newsletter printing

and postage expense in excess of the cost of printing the newsletters which were made available

to the nonmembers in the union offices was improperly deemed chargeable.

### 4.     Conference and convention expenses

Plaintiffs challenge the conference and convention expenses, asserting that one workshop

focused solely on union organizing and thus its associated expenses were improperly deemed

chargeable.  Nonmembers may be required to pay their fair share of expenses associated with

conferences and conventions where union members "establish bargaining goals and priorities"

and "formulate overall union policy."  Ellis, 466 U.S. at 442; see also Lehnert, 500 U.S. at 592

(discussing with approval the Ellis Court's rationale for deeming the challenged union

convention expenses germane and chargeable).  Generally, conferences and conventions facilitate

a union's effective performance as an exclusive bargaining agent by providing a forum where the

union's associational existence is maintained and union members are able to confer regarding the

union's overall goals and policies.  Ellis, 466 U.S. at 442.  Nonetheless, a conference which

focuses solely on union organizing is not properly deemed chargeable because as stated above,

the underlying activity of union organizing places a significant burden on the free speech rights

of nonmembers.  Thus, expenses associated with the sole seminar which had a singular agenda of union organizing were improperly deemed chargeable.

### 5. Personnel costs

Lastly, Plaintiffs challenge all personnel costs, arguing that the failure of the employees of District Council 33 and the locals to maintain contemporaneous time records disallowed an accurate calculation of time spent on chargeable and nonchargeable activities.  While absolute precision in the calculation of the agency fee cannot be expected or required, the union must provide sufficient evidence to justify its calculation.  E.g., Allen, 373 U.S. at 122.  While the evidence at trial established that the union employees were able to respond to Mr. Person's inquiries regarding their chargeable and nonchargeable activities with candor and sufficient memory, the evidence also established that in the area of personnel expenses, Mr. Person seeks to elucidate nonchargeable time which he then deducts from total time to obtain chargeable time. While Mr. Person's method for calculating the chargeable portion of personnel time is both reasonable and appropriate, see Hohe, 956 F.2d at 414-15, and the employees who worked during the relevant period and testified at trial sufficiently established that they were able to substantiate their activities by memory at the time of the interviews, the maintenance of contemporaneous activity reports by all employees of District Council 33 and the locals would provide a more accurate representation (and written substantiation) of the time spent on chargeable activities.[8]

### CONCLUSION

The procedures used by AFSCME International, District Council 33, and the local unions

---

[8] Defendant's contentions that contemporaneous time records cannot be maintained due to the varied and busy nature of the employees' jobs is belied by the time-recording system of AFSCME International's headquarters and field staff, which system has notably not been challenged by the nonmembers.

to calculate their agency fees were reasonable and expenses properly deemed chargeable with the following exceptions: (1) District Council 33's organizing expense in fiscal year 1996, (2) newsletter printing and mailing expenses in excess of the expense incurred to print the copies made available to nonmembers in the union offices, and (3) expenses for the seminar which focused <u>solely</u> on union organizing.  With respect to personnel expenses (and all expenses derived therefrom), while the union's chargeable and nonchargeable allocation would be improved by the use of activity reports by all employees, the unions allocation was reasonable and appropriate.

An appropriate Order follows.